Kathleen R. Scanlan (SBN 197529)
kscanlan@kellergrover.com
**KELLER GROVER LLP**
1965 Market Street
San Francisco, CA 94103
Telephone: (415) 543-1305
Facsimile: (415) 543-7861

**SEALED**

*Counsel for Relator-Plaintiff*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* **CAMILLE STACKHOUSE**, Plaintiffs, v. **WEST COAST WOUND & SKIN CARE, INC.**, Defendant. | Civil Action No. 1:24-cv-01445-JLT-EPG  COMPLAINT AND DEMAND FOR JURY TRIAL  **IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730** |

**COMPLAINT**
**SEALED CASE---DO NOT ENTER ON PACER**

---

COMPLAINT　　　　　　　　　　　　1　　　　　　　　　　　　CASE NO. _____

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

KELLER GROVER LLP
1965 Market Street, San Francisco, CA 94103
Tel. 415.543.1305 | Fax 415.543.7861

**INTRODUCTION**

1. During the course of Relator Camille Stackhouse's employment with Defendant West Coast Wound & Skin Care, Inc. ("West Coast"), she discovered that the company was defrauding Medicare, primarily by instituting a standing order that Medicare patients receive an unauthorized and highly reimbursed regime of Low-Frequency, Non-Contact, Non-Thermal Ultrasound therapy ("MIST Therapy," CPT Code 97610). Under West Coast's fraudulent standing order, MIST Therapy was not prescribed or administered by a medical provider to patients that the provider determined qualified for the therapy; rather, a clerical employee of West Coast's central office instructed medical assistants to perform the procedures and then West Coast's central billing department used its providers' NPI numbers to bill for them. Ms. Stackhouse also discovered that West Coast was using her NPI number to double and triple bill for single visits to her patients. West Coast's fraudulent practices have likely cost Medicare millions of dollars.

2. When Ms. Stackhouse complained about West Coast's fraudulent practices to a West Coast administrator, West Coast unlawfully retaliated against her and forced her to resign.

3. This is an action brought by Relator on behalf of herself and the United States to recover treble damages and civil penalties under the False Claims Act (FCA), 31 U.S.C. §§ 3729-33, based on Defendant's false statements to the government and false claims Defendant submitted or caused to be submitted to the government for reimbursement under the Medicare program.

**JURISDICTION AND VENUE**

4. This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False Claims Act"). Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over the related state law retaliation claim under 28 U.S.C. § 1367. Jurisdiction is also authorized under 31 U.S.C. § 3732(a). The acts proscribed by 31 USC § 3729(a) and described in this complaint occurred in this district and elsewhere in the United States.

5. Venue lies in this judicial district under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b), (c), because Defendant is qualified to do business in the state of California, transact substantial business in the state of California, transact substantial business in this judicial district, and can be found here. Additionally, and as described herein, Defendant committed acts proscribed by 31 U.S.C. § 3729 within this judicial district. Specifically, Defendant submitted and caused to be submitted false claims within this judicial district.

## PARTIES

6. Defendant West Coast Wound and Skin Care, Inc. is a California corporation with its principal place of business in California. One of West Coast's main offices is in Fresno, California. West Coast can be served c/o Northwest Registered Agent, Inc. at 2108 N St., Suite N, Sacramento, CA 95816-5712.

7. Relator Camille Stackhouse is an adult citizen and licensed Physician's Assistant (PA) living in Chicago, IL. Relator worked for West Coast from May 2024 to July 2024.

## DISCLOSURE

8. Prior to filing this Complaint, Relator voluntarily disclosed to the United States the information upon which this action is based. To the extent that any public disclosure has taken place as defined by 31 U.S.C. § 3739(e)(4)(A), Relator is the original source of the information for purposes of that section. Alternatively, Relator has knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Relator voluntarily provided that information to the Government before filing this Complaint. Relator is serving contemporaneously herewith a statement of the material evidence in her possession upon which her claims are based.

## BACKGROUND

**I.   BACKGROUND: MEDICARE**

9. Through the Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.*, the United States provides health insurance coverage for eligible citizens. The United States Department of Health and Human Services, specifically the Center for Medicare and Medicaid Services ("CMS"), oversees the administration of Medicare.

10. An individual may be entitled to Medicare coverage based on his or her age, disability, or affliction with end-stage renal disease. 42 U.S.C. § 426. Individuals who are insured under Medicare are referred to as Medicare "beneficiaries."

11. There are four Parts to the Medicare Program: Part A authorizes payment for institutional care, including inpatient hospital care, skilled nursing facility care, and home health care, see 42 U.S.C. §§ 1395c-1395i-4; Part B primarily covers outpatient care, including physician services and ancillary services, see 42 U.S.C. § 1395k; Part C is the Medicare Advantage Program, which provides Medicare benefits to certain Medicare beneficiaries through private health insurers, called Medicare Advantage Organizations ("MAOs"), *see* 42 U.S.C. § 1395w-21, *et seq.*; and Part D provides prescription drug coverage, see 42 U.S.C. § 1395w-101, et seq.; 42 C.F.R. § 423.1, *et seq.*

### A. MEDICARE PART B

12. CMS contracts with Medicare Administrative Contractors ("MACs") to assist in the administration of Medicare Parts A and B. *See* Fed. Reg. 67960, 68181 (Nov. 2006). MACs generally act as CMS's agents in reviewing and paying Part A and Part B claims submitted by healthcare providers and perform administrative functions on a regional level. See 42 C.F.R. § 421.5(b); *see also* 42 U.S.C. §§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.100, 421.104.

13. CMS (through MACs) makes payments retrospectively for hospital outpatient services, after the services are rendered.

14. Under Medicare Part B, a provider may submit claims for reimbursement using either a hard copy or electronic CMS 1500 form. In doing so, the signer must certify that he/she has knowledge of Medicare's requirements, and that the individual claim complies with applicable laws and regulations.

### B. MEDICARE CERTIFICATIONS

15. Medicare regulations require providers and suppliers to certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations. 42 C.F.R. § 424.516(a)(1).

16. To participate in the Medicare program, providers must submit a Medicare Enrollment Application, Form CMS-855B. These entities must also complete Form CMS-855B to change information or to reactivate, revalidate, and/or terminate Medicare enrollment.

17. Form CMS 855B requires signatories to certify that they "agree to abide by the Medicare laws, regulations and program instructions that apply" and "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback Statute and the Stark law)." An authorized official must sign the "Certification Section" in Section 15 of Form CMS-855B, which "legally and financially binds [the] supplier to all of the laws, regulations, and program instructions of the Medicare program."

18. Medicare pays "claims," which are requests by a health care provider to be reimbursed (paid) for services provided to Medicare recipients. A claim contains a variety of information, including where the medical service was provided, the dollar amount being billed to Medicare, and an identification number for the health care provider (such as a physician).

19. When submitting claims to Medicare, providers certify on the CMS 1500, *inter alia*, that their claims comply "with all applicable Medicare . . . laws, regulations, and program instructions for payment."

20. Generally, once a provider submits a CMS 1500, or the electronic equivalent, to the Medicare program, the claim is paid directly to the provider, in reliance on the foregoing certifications, without review of supporting documentation.

**C.    UNNECESSARY OR UNAUTHORIZED SERVICES**

21. Medicare pays "claims," which are requests by a health care provider to be reimbursed (paid) for services provided to Medicare recipients. A claim contains a variety of information, including where the medical service was provided, the dollar amount being billed to Medicare, and an identification number for the health care provider (such as a physician).

22. A claim also contains a code for the procedure or service performed. Those codes are called the "CPT codes," which stands for Current Procedural Terminology codes. CPT codes are a national uniform coding structure created for use in billing and overseen by the American

Medical Association. They are used by all health insurance companies and by Medicare and Medicaid. A code represents at least two things: the procedure/service performed and the complexity level involved.

23. Generally, for any given category of procedure, the more complex the procedure, the higher the number used for its code. In turn, a higher CPT code generally receives more reimbursement amount from Medicare.

24. Medicare only pays for services that are reasonable and necessary for the diagnosis or treatment of illness or injury to improve the functioning of a malformed body member. 42 U.S.C. §1395y(a)(1)(A).

25. Fraud can occur when a provider performs a procedure that is medically unnecessary in order to intentionally generate larger Medicare reimbursements.

26. Fraud can also occur when a non-provider person (such as a clerical employee) instructs someone (such as a medical assistant) to perform a procedure that has not been authorized by a licensed provider.

27. Fraud can also occur when a medical company (such as Defendant) institutes a standing order that a particular procedure must be performed on patients. Standing orders do not comply with the requirement that a provider must determine in their medical judgment that a procedure on a particular patient is necessary. Standing orders are also particularly conducive to abuse and fraud, as demonstrated by Defendant's conduct here.

## II. DEFENDANT'S FRADULENT PRACTICES

### A. THE COMPANY

28. West Coast was founded in Burbank, California, in 2017 by David Kay, DO (NPI # 1205254992). Its corporate headquarters is in Burbank, California, and one of its main offices is in Fresno, California.

29. Dr. Kay is the CEO of West Coast. Other officers are Tova Bayever (Secretary), Adam Knapp (CFO), and Kathy Brown (Director). Dr. Michael Illingworth was West Coast's Regional Medical Director in Fresno, California, from 2022-2023.

30. According to West Coast's website, it has 14 service areas in seven states: California, Nevada, Arizona, Colorado, Texas, Illinois, and Florida.

31. California, Florida, and Texas are West Coast's largest centers of operation. West Coast employs between fifty and one hundred licensed medical providers, most of whom are physician's assistants and nurse practitioners. West Coast additionally employs numerous non-licensed employees, such as medical assistants and office staff.

32. West Coast describes itself as a company that provides "full spectrum wound care services to patients wherever they reside." Many or most of the services that West Coast provides are provided at a patient's home or other offsite, patient-specific facility (such as the patient's nursing home).

**B.    MIST THERAPY: A HUGELY PROFITABLE PROCEDURE**

33. As discussed in the introduction, this complaint is primarily based on Defendant's abuse of a particularly highly reimbursed procedure, MIST Therapy (CPT Code 97610). West Coast bills $1,650 per MIST therapy session administered. Medicare paid West Coast more than $400 per MIST therapy session.

34. MIST therapy is highly profitable.[1]

35. MIST therapy is almost always used in conjunction with more traditional wound care techniques, such as debridement.

---

[1] Whether MIST Therapy is as medically beneficial to West Coast's patients as it is profitable to West Coast is ultimately irrelevant to West Coast's liability. Still, it is notable that private insurers such as Blue Cross Blue Shield and United Healthcare do not cover MIST Therapy because it is considered "experimental" or "unproven." CMS has noted that scientists have expressed concerns about the efficacy of MIST Therapy versus its cost. *See, e.g.*, BCBS Medical Policy, available at https://www.bcbsm.com/amslibs/content/dam/public/mpr/mprsearch/pdf/2000287.pdf; UHC Policy, at https://www.uhcprovider.com/content/dam/provider/docs/public/policies/comm-medical-drug/noncontact-warming-therapy-ultrasound-therapy-wounds.pdf; Guidance Document, p. 7 ("Because the degree of (any) effectiveness . . . [of MIST Therapy] remains highly uncertain, any calculation of cost effectiveness must be highly uncertain."), available at https://www.nice.org.uk/guidance/mtg5/documents/mist-therapy-system-for-the-promotion-of-wound-healing-in-chronic-and-acute-wounds-assessment-report2.; LCD L35125 (taking note of a study concluding "that additional work on cost-effectiveness outcomes and planning are greatly needed for the future studies" of MIST), available at https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=35125.

36. MIST therapy can be administered using an inexpensive, portable device that can be easily operated by a non-provider technician (such as a medical assistant) virtually anywhere. The active ingredient is saline. The MIST Therapy device has user-friendly controls, a transporter head to transport energy, a single use applicator and a sterile saline bottle. After the wound surface area is selected on the MIST Therapy device, the appropriate treatment time is automatically determined. Once the applicator and saline bottle are attached, treatment commences. A continuous mist is delivered across the wound bed via slow, even strokes. Most treatments with the MIST Therapy device take 5-7 minutes to complete and are performed when the wound dressings are changed.

37. MIST Therapy can be administered to a patient three times per week for six weeks (18 times).

38. Accordingly, instituting a regime of MIST Therapy can generates between approximately $7,000 and $30,000 per patient, nearly all of which is profit.

39. MIST Therapy must be ordered/prescribed by a licensed medical provider. Moreover, MIST Therapy can only be provided and billed if it is "medically necessary based on the provider's documentation of a medical evaluation of the patient's condition, diagnosis, and plan."[2]

40. To be appropriate at all, a qualified provider must assess the individual patient and determine that MIST Therapy is appropriate for that specific patient, for that specific wound, and that specific circumstance.

41. Moreover, Defendant cannot legally bill for MIST Therapy and other types of wound care for the same wound on the same day. The MIST Therapy "CPT Code 97610 is not separately reportable for treatment of the same wound on the same day as other active wound care management CPT codes (97597-97606) or wound debridement CPT codes (e.g., CPT codes

---

[2] See "Billing and Coding: Wound and Ulcer Care," A58565, available at https://www.cms.gov/medicare-coverage-database/view/article.aspx?articleid=55818&ver=20&=; A53001, available at https://www.cms.gov/medicare-coverage-database/view/article.aspx?articleID=53001; *see also* https://www.accessdata.fda.gov/cdrh_docs/pdf5/k050129.pdf (MIST Therapy is indicated for prescription use); https://www.accessdata.fda.gov/cdrh_docs/pdf13/k131096.pdf (same).

COMPLAINT   8   CASE NO. _____

11042-11047, 97597, 97598).” See "Billing and Coding Wound Care," A55818, available at https://www.cms.gov/medicare-coverage-database/view/article.aspx?articleid=55818&ver=20&=.

42. Moreover, providers may only bill Medicare for care that complies with applicable Local Coverage Determinations (LCDs). An LCD is a determination of what is "medically reasonable" under Medicare rules and binds providers for what claims can be submitted to Medicare. The LCDs that govern provision of MIST Therapy by Defendant all contain materially similar statements about when Medicare will cover MIST Therapy. For example, L35123 states:

> "Low-Frequency, Non-Contact, Non-Thermal Ultrasound (MIST Therapy) is considered reasonable and necessary wound therapy and therefore eligible for coverage by Medicare when provided for any of the following clinical conditions:
>
> a. Wounds and ulcers which are too painful for sharp or excisional debridement and have failed conventional debridement with documentation supporting the same.
>
> b. Wounds and ulcers meeting Medicare coverage for debridement but with documented contraindications to sharp or excisional debridement. [or]
>
> c. Wounds and ulcers meeting Medicare coverage for debridement but with documented evidence of no signs of improvement after 30 days of standard wound care."

LCD L35125, available at https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=35125; *see also* L38902 (applicable in California) and L38904.

43. In other words, LCDs require that a medical provider exercise their medical judgment as to whether the specific wound for the specific patient that will be treated by MIST Therapy meets those coverage criteria. The eligibility criteria for MIST Therapy involve specific documentation of that medical necessity by a medical provider. Not all wounds or patients qualify.

### C. WEST COAST'S CORPORATE DIRECTIVE USURPED ITS PROVIDERS' ROLE AND INSTITUTED A STANDING ORDER FOR MIST THERAPY ON MEDICARE PATIENTS

44. West Coast's course of conduct toward Relator is illustrative of its overarching corporate scheme of usurping a provider's role with patient care to generate fraudulent profits at the expense of the government.

45. The majority of West Coast's licensed providers are physician's assistants or nurse practitioners. Most of these providers are relatively new to the profession. West Coast appears to have a high turnover rate for providers.

46. For example, Ms. Stackhouse applied for a job with West Coast through a LinkedIn advertisement that West Coast posted. West Coast uses LinkedIn to advertise jobs across the country, including in Fresno, California. West Coast did not require her to have specific experience with complex wound treatment of the kind that West Coast offers, and West Coast gave Ms. Stackhouse little training before sending her out to care for patients who needed wound care.

47. West Coast made little or no effort to train Ms. Stackhouse as to when MIST Therapy was appropriate or medically necessary for patients because, under West Coast's business model, Ms. Stackhouse would not be prescribing MIST Therapy for patients or supervising its administration.

48. Rather, the company itself ordered MIST Therapy pursuant to a company-wide standing order emailed by a non-licensed clerical employee in West Coast's corporate office to providers such as Ms. Stackhouse and non-provider medical assistants. Medical assistants performed MIST Therapy independent of the providers. In doing so, West Coast usurped the role of the medical provider with its patients and charged Medicare for procedures that had not been authorized.

49. Shortly after Ms. Stackhouse began working for West Coast, West Coast informed her and others that "We MIST patients 2-3x a week" unless the patient was affirmatively opted out of the treatment by emailing misttracking@westcoastwound.com. None of the qualifications required by the applicable LCD for coverage for MIST Therapy were

mentioned, and indeed, West Cost imposes its standing order without even asking providers if a wound met those qualifications.

50. Notably, the standing order was implemented almost exclusively on Medicare patients. Defendant did not try this scheme on private insurers, because private insurers such as Blue Cross Blue Shield do not cover MIST Therapy because it is considered "experimental." *See* note 1, *supra*.

51. The standing order instruction came from the "MIST Coordinator" in West Coast's corporate office in California. The MIST Coordinator, Racquel Tolentino, is not a licensed medical provider. The MIST Coordinator sends similar emails imposing the standing order to other providers and non-providers employed by the West Coast, not merely Ms. Stackhouse.

52. West Coast then instructed its own medical assistants to administer MIST Therapy to Ms. Stackhouse's patients at their residences without her prescription, input, or supervision. Indeed, Ms. Stackhouse only learned that many of her patients were receiving MIST Therapy long after they received it, after she saw West Coast's billing for her patients.

53. Approximately two months after she began working for West Coast, Ms. Stackhouse received a spreadsheet from a West Coast biller that showed the charges West Coast had made under her NPI. Many of those charges were fraudulent: West Coast had double or tripled billed for procedures (*e.g.*, CPT Codes 99349, 97550, 99344, 11042) that patients had received on a single visit and a single day; and many of her patients had been charged exorbitant prices for MIST Therapy (CPT Code 97610) that she had never prescribed. At $1,650 per charge, the MIST Therapy applications were the most expensive single-item charges on the list of nearly 500 charges to Ms. Stackhouse's patients.

54. Moreover, some patients were improperly billed twice for MIST Therapy administered on the same day (*i.e.*, two entries for CPT Code 97610 were charged on the same day).

55. If they stayed on her caseload more than a couple days, nearly every one of Ms. Stackhouse's Medicare Illinois patients were fraudulently billed for MIST Therapy administrations that Ms. Stackhouse had not prescribed.

56. As just a few examples, West Coast fraudulently submitted bills to Medicare for MIST therapy administered to these patients on these days:

    a. J.H. on 6/6/24, on 6/7/24, on 5/31/24, 5/30/24, and 5/24/24 (each twice per day);
    b. V.W. on 6/26/24, 6/18/24, 6/11 (twice);
    c. J.F. on 7/12/24, 7/11, 7/8, 6/28, 6/26, and 6/24.

57. West Coast's MIST Therapy practice is widespread and costly. Defendants' providers have billed and Medicare has paid at least $1 Million in MIST Therapy procedures. For example, in 2022 alone, West Coast's Fresno Regional Medical Director, Dr. Michael Illingworth (NPI 1932251089), charged CPT Code 97610 nearly 1,000 times; NPI 1891791703 charged MIST Therapy (CPT Code 97610) more than 1,200 times; and CEO David Kay charged CPT Code 97610 nearly 300 times. Medicare paid approximately $400 per charge.

58. On July 17, 2024, Ms. Stackhouse complained of these fraudulent charges to multiple people in West Coast's corporate and billing offices, including directly to Ms. Bayever, an officer of the corporation, and Desmond Ortega, the finance manager. Ms. Stackhouse also demanded to speak to West Coast's Medical Director. That same day, Ms. Bayever responded by acknowledging the charges, falsely accusing Ms. Stackhouse of failing to care for her patients, withholding her pay, and offering to accept her resignation from West Coast. These actions constructively terminated Ms. Stackhouse's employment because of her complaint of fraud and illegal conduct by Defendant. Ms. Stackhouse was forced to resign on July 19, 2024.

59. West Coast's use of standing orders to administer MIST Therapy to patients was implemented by West Coast nationwide and caused extensive unlawful charges to Medicare. West Coast's use of an established system which relied upon employing medical providers with little training regarding MIST therapy, imposing standing orders implemented by non-providers with no determination of medical necessity, and its swift retaliation against Ms. Stackhouse for

questioning this system, evidence a widespread and established scheme of Medicare fraud – not a single aberration.

60. The Government would not have paid West Coast's claims for thousands of MIST Therapy procedures had it known that the therapy was being administered pursuant to the above-described fraudulent scheme. Indeed, a federal court recently held that similar allegations about a standing order scheme were sufficient to plead fraud under the False Claims Act. *See United States ex rel. Allstate Ins. Co. v. Phoenix Toxicology & Lab Servs., LLC*, No. CV 22-6303 (RMB/AMD), 2024 WL 2785396, at *8-10 (D.N.J. May 30, 2024).

## CAUSES OF ACTION

### COUNT ONE: FALSE CLAIMS

61. Relator adopts and incorporates the previous paragraphs as though fully set forth herein.

62. By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval, as follows:

    a. Defendant fraudulently double and triple billed for single visits to patients (*e.g.*, CPT Codes 99349, 97550, 99344, 11042);

    b. Defendant fraudulently billed for MIST Therapy (CPT Code 97610) under a corporate standing order and without a provider's prescription.

63. The United States paid the false claims described herein.

64. Defendant's fraudulent actions, as described *supra*, are part of a widespread, systematic pattern and practice of knowingly submitting or causing to be submitted false claims to the United States through fraudulent use of codes and fraudulent billing of the United States through Medicare.

65. Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States through Medicare for such false or fraudulent claims.

66. WHEREFORE, Relator demands judgment in Relator's favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, award of the maximum relator share allowed by law, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

### COUNT TWO: FALSE RECORDS

67. Relator adopts and incorporates the factual allegations contained in the previous paragraphs (except those in Count One) as though fully set forth herein.

68. By and through the fraudulent schemes described herein, Defendant knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States in that Defendant fraudulently used the coding system and other false records intended to support its fraudulent billing to the United States, all in violation of federal statutes and regulations.

69. The false records or statements described herein were material to the false claims submitted, or caused to be submitted, by Defendant to the United States.

70. In reliance upon Defendant's false statements and records, the United States paid false claims that it would not have paid if not for those false statements and records.

71. Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States for such false or fraudulent claims.

72. WHEREFORE, Relator demands judgment in Relator's favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendant's conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, award of the maximum relator share allowed by law, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

**COUNT THREE: VIOLATION OF THE ILLINOIS WHISTLEBLOWER ACT
740 ILCS 174/1 *et seq.***

73. Relator adopts and incorporates the factual allegations contained in the previous paragraphs (except those in previous counts) as though fully set forth herein.

74. Relator engaged in conduct protected under the Illinois Whistleblower Act, 740 ILCS 174/1 *et seq. See supra* ¶¶ 52, 57. In particular, Relator refused to participate in Defendant's illegal practices when she learned of them and disclosed and threatened to disclose Defendant's illegal practices to supervisors. *See* 740 ILCS 174/15, 174/20.

75. Defendant retaliated against Relator by harassing her and constructively terminating her employment. *See supra* ¶ 57.

76. Relator suffered loss of income, reputation, and other financial damages and mental anguish because of Defendant's retaliatory actions.

77. WHEREFORE, Relator demands judgment in Relator's favor and against Defendant, for remedies provided by the Act, including liquidated damages of $10,000, compensation for all damages, interest, and costs incurred as a result of the violation, including litigation costs, expert witness fees, and reasonable attorney's fees; a civil penalty of $10,000, and such other, different, or further relief to which Relator may be entitled.

**COUNT FOUR: RETALIATION UNDER THE FCA**

78. Relator adopts and incorporates the factual allegations contained in the previous paragraphs (except those in previous counts) as though fully set forth herein.

79. Relator engaged in conduct protected under the False Claims Act's anti-retaliation provision. *See supra* ¶¶ 52, 57.

80. Defendant retaliated against Relator by harassing her and constructively terminating her employment. *See supra* ¶ 57. Those actions violated the False Claims Act's anti-retaliation provision.

81. Relator suffered loss of income, reputation, and other financial damages and mental anguish because of Defendant's retaliatory actions.

82. WHEREFORE, Relator demands judgment in Relator's favor and against Defendant, for compensatory, special, and punitive damages, together with an amount equal to treble the damages sustained by reason of Defendant's conduct, civil penalties as permitted by law, attorneys' fees, costs, and interest, the maximum Relator share allowed by law, and such other, different, or further relief to which Relator may be entitled.

## JURY DEMAND

83. Relator, on behalf of herself and the Government, demands a jury trial on all claims alleged.

Dated: November 25, 2024

By: _____
Kathleen R. Scanlan (SBN 197529)
kscanlan@kellergrover.com
**KELLER GROVER LLP**
1965 Market Street
San Francisco, CA 94103
Tel: (415) 543-1305
Fax: (415) 543-7861

*Attorney for Relator-Plaintiff*